# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

       Plaintiff,

v.

       Civil No.
       Honorable
       Magistrate

Eighty-Four Thousand Five Hundred
Eighty-Seven Dollars ($84,587.00) in
U.S. Currency; Sixty Thousand Dollars
($60,000.00) in U.S. Currency; Two
Hundred Forty-Six Thousand Five
Hundred Fifty-Four Dollars and
Eighty-Six Cents ($246,554.86) in
U.S. Currency from JPMorgan Chase
Bank Account Number xxxxxxxxxx1373;
Twenty-Five Thousand Nine Hundred
Sixty-Five Dollars and Eighty-Four Cents
($25,965.84) in U.S. Currency from New
Horizons Credit Union Account Number
xxxxx3059; and One Thousand Forty-Nine
(1,049) Electronic Items and Accessories,
Including, Without Limitation, Cell Phones,
Tablets, Laptops, Desktop Computers,
Cameras, Thermostats, Security Systems,
Keyboards, Headphones, and Watches,
with a Combined Value of approximately
$469,099.00,

       Defendants *in rem*,

---

## COMPLAINT FOR FORFEITURE

---

Plaintiff, the United States of America, by and through Matthew Schneider, United States Attorney for the Eastern District of Michigan, and Adriana Dydell, Assistant United States Attorney, states the following in support of this Complaint for Forfeiture:

## Jurisdiction and Venue

1.     This is an *in rem* civil forfeiture action under Title 18, United States Code, Section 981(a)(1)(C) and/or Sections 981(a)(1)(A), 984.

2.     This Court has original jurisdiction over this forfeiture action under Title 28, United States Code, Section 1345 because this action is being commenced by the United States of America as Plaintiff.

3.     This Court has jurisdiction over this forfeiture action under Title 28, United States Code, Sections 1355(b)(1)(A) and (B), because acts or omissions giving rise to the forfeiture occurred in the Eastern District of Michigan and venue for this forfeiture action is proper under Title 28, United States Code, Section 1395(a).

4.     Venue is proper before this Court under Title 28, United States Code, Section 1391(b)(2) because a substantial part of the events

or omissions giving rise to the Government's claims occurred in the Eastern District of Michigan.

5.    Venue is also proper before this Court under Title 28, United States Code, Section 1395(a) and (b) because the action accrued in the Eastern District of Michigan and/or because a Defendant *in rem* was found in this district. Venue is also proper before this Court under Title 18, United States Code, Section 981(h) because the underlying criminal investigation and related prosecution is occurring in this district.

## Defendants *in rem*

6.    The Defendants *in rem* consist of:

a.    Eighty-Four Thousand Five Hundred Eighty-Seven Dollars ($84,587.00) in U.S. Currency;

b.    Sixty Thousand Dollars ($60,000.00) in U.S. Currency;

c.    Two Hundred Forty-Six Thousand Five Hundred Fifty-Four Dollars and Eighty-Six Cents ($246,554.86) in U.S. Currency from JPMorgan Chase Bank Account Number xxxxxxxxxx1373;

d.    Twenty-Five Thousand Nine Hundred Sixty-Five

Dollars and Eighty-Four Cents ($25,965.84) in U.S. Currency from New Horizons Credit Union Account Number xxxxx3059; and

e.    One Thousand Forty-Nine (1,049) Electronic Items and Accessories, Including, Without Limitation, Cell Phones, Tablets, Laptops, Desktop Computers, Cameras, Thermostats, Security Systems, Keyboards, Headphones, and Watches, with a Combined Value of approximately $469,099.00.

7.    Agents of Homeland Security Investigations seized the Defendants *in rem* in the Eastern District of Michigan and the Southern District of Ohio on or about April 10, 2019, pursuant to federal search and seizure warrants. The Department of Homeland Security currently has custody of the Defendants *in rem*. Specifically, the Defendants *in rem* are in the custody of Homeland Security Investigations in the Eastern District of Michigan and the District of New Jersey and U.S. Customs and Border Protection, Fines, Penalties, and Forfeitures Office in the Eastern District of Michigan and the

Southern District of Ohio.

## Violation Statutes

8.   Title 18, United States Code, Section 371 makes it a federal offense for two or more persons to conspire to commit a federal crime.

9.   Title 18, United States Code, Section 554 makes it a federal offense, to knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States.

10.   Title 18, United States Code, Section 1952(a) makes it a federal offense to use the mail or any facility in interstate or foreign commerce to distribute the proceeds of unlawful activity, or to otherwise promote or facilitate the promotion, or carrying on, of unlawful activity.

11.   Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) makes it a federal offense for anyone, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, to conduct or attempt to conduct a financial transaction, which involves the proceeds of specified unlawful activity, either with the intent to promote the carrying on of the

specified unlawful activity or knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

12. Title 18, United States Code, Section 1957 makes it a federal offense to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000, which is derived from a specified unlawful activity.

13. Title 18, United States Code, Section 2314 makes it a federal offense for anyone to transport, transmit, or transfer in interstate or foreign commerce any goods, wares, merchandise securities, or money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud.

14. Title 18, United States Code, Section 2315 makes it a federal offense for anyone to receive, possess, conceal, store, barter, sell, or dispose of any goods, wares, merchandise securities, or money, of the value of $5,000 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken.

## Statutory Basis for Civil Forfeiture

15.   Title 18, United States Code, Section 981(a)(1)(A) provides for civil forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960, or any property traceable to such property.

16.   Title 18, United States Code, Section 981(a)(1)(C) provides for civil forfeiture to the United States of, "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Violations of Title 18, United States Code, Sections 554, 1952, 1956, 1957, 2314, and 2315 are specified unlawful activities under Title 18, United States Code, Sections 1956(c)(7)(D) and/or 1961(1)(B).

17.   Title 18, United States Code, Section 984 provides that in any *in rem* forfeiture action involving funds deposited into a financial institution account, it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture.

## Possible Companion Criminal Case

18.    There is a possible companion criminal case pending in the Eastern District of Michigan, *United States v. D-1 Frank Manni, Jr., et al.* Case No. 19-cr-20389, Honorable Nancy G. Edmunds presiding.

## Factual Basis for Civil Forfeiture

19.    The Defendants *in rem* constitute property derived from proceeds traceable to one or more violations of Title 18, United States Code, Sections 371, 554, 1952, 1956, 1957, 2314, and 2315 and/or property involved in a transaction or attempted transaction in violation of Sections 1956 or 1957. Evidence supporting this determination includes, but is not limited to, the following:

a.    In 2018, Homeland Security Investigations (HSI) learned of an organization involved in the sale of stolen and/or fraudulently obtained electronic devices. Through this and other investigations, HSI agents learned that iPhones and other high-end electronic devices can be sold overseas at a profit.

b.    Investigation revealed that Frank Manni Jr. (Manni), Abdulsamed Montaser (Montaser), and others, purchased and sold

fraudulently obtained high-end electronic devices, primarily iPhones, for a profit. Manni and Montaser operated Ace Future Wireless (Ace), a telephone retail and repair store in Taylor, Michigan.

c.   Ace purchased electronics from individuals who acquired them through various means. Ace, through Manni and Montaser, sold and transported the electronics to out of state businesses in Arizona and Ohio. These out of state businesses then shipped and sold the electronics, primarily iPhones, to businesses overseas.

d.   The investigation identified several individuals who admitted selling stolen or fraudulently obtained iPads and iPhones to Ace. One of these individuals admitted to fraudulently obtaining iPhones from big box stores like Walmart, Sam's Club and Target. The investigation also revealed at least one employee of a big box store who exploited an in-house customer database in order to determine which customers were available for a phone upgrade. After identifying eligible customers, the employee would add a predetermined number of iPhones to the customers' accounts, and provide the phones to individuals posing as these customers.

e.    In late 2018, an undercover HSI agent (UC-1) sold several iPhones to Ace in exchange for cash. In one of the transactions, UC-1 told Montaser that the phones "haven't even been inventoried" and are "straight off the truck." Montaser first checked the phones offered for sale on his computer to make sure they had not been reported stolen. UC-1 asked Montaser what would happen if someone reported the phones stolen within the next week, and Montaser replied that it would not be a problem because the phones would be out of the country by then.

f.    Because Ace paid cash for the electronics that it purchased, it required significant amounts of cash to perpetrate the scheme. As further discussed below, bank records show that large amounts of cash were withdrawn from several bank accounts controlled by Ace.

g.    In 2018, Ace regularly shipped electronic devices to Mobile Tech Buyback LLC (Mobile Tech) in Scottsdale, Arizona. Michael Stoian (Stoian) controlled Mobile Tech. Investigation revealed that Mobile Tech paid Ace by various means. For example, on September 27, 2018, Comerica account ending 7939 titled to Montaser received a $169,978

10

wire from Mobile Tech.

h.    In October 2018, law enforcement executed a search warrant for a package sent from Ace to Mobile Tech. Among other things, the package contained seventy-two iPhones. Subsequent analysis of the phones confirmed that twenty-six of the iPhones were Verizon iPhones, and of those twenty-two were fraudulently obtained.

i.    On October 16, 2018, HSI agents and Arizona law enforcement officers executed a search warrant at Mobile Tech. The search recovered approximately 700 cell phones, $120,000 in cash, and numerous documents from Ace. Among the electronics, investigators found shipments from Ace that contained stolen and fraudulently obtained cell phones, including two iPhones that an undercover HSI agent sold to Montaser. Stoian was arrested during the search of Mobile Tech.

j.    After the Mobile Tech search, Manni and Montaser increased sales of electronic devices to Prime Cellular Solutions, Inc. (Prime), the operator of iMobile Expert (iMobile) at 9621 Cincinnati Columbus Road in Cincinnati, Ohio. Prime's Articles of Incorporation

identify Ibrahim Farhan (Farhan) as the statutory agent.

k.      Phone records show that between January 3, 2018 and March 14, 2019, Manni had 68 voice calls with Farhan. Montaser's phone records show 16 voice calls with Farhan between October 17, 2018 and February 2, 2019.

l.      Records show that Ace regularly shipped electronic devices to Prime. For example, FedEx shipping information for Ace showed that between October 19, 2018 and January 10, 2019, Ace sent 104 shipments to Farhan at iMobile's address in Cincinnati. The shipments from Ace to Farhan continued through at least March 2019.

m.      In October 2018, HSI obtained a search warrant for several FedEx boxes that Montaser shipped to Farhan. The searched boxes contained 52 cell phones. Of these 52 cell phones, ATT identified 7 of the phones as ATT carrier phones and determined that all 7 were fraudulently obtained. In addition, Verizon identified 10 of the phones as Verizon carrier phones and determined that all 10 were fraudulently obtained.

n.      Investigation revealed that Prime paid Ace for these

electronic shipments by wire transfer and cash. Bank records show wire transfers from Prime to accounts controlled by Ace and its associates. Investigation and surveillance also revealed that Montaser traveled to Cincinnati to pick up cash payments.

o.      In October 2018, agents obtained a warrant to place a tracking device on Montaser's vehicle. On October 30, 2018, agents tracked Montaser's vehicle from Michigan to the iMobile store in Cincinnati. An agent observed Montaser arrive at the store at about 8:30 p.m., enter the store, and leave about 30 minutes later, carrying a large UPS shipping envelope. Montaser then left Cincinnati and took northbound I-75 back to Michigan. During a traffic stop and consensual search of Montaser's vehicle, agents found $65,000 cash in the UPS shipping envelope. In an interview, Montaser stated that he was coming back from Ohio after picking up invoices and that he had $65,000 cash with him. The invoices Montaser had did not support the entire $65,000 cash payment.

p.      On June 11, 2019, Manni and Montaser were charged in a federal criminal Information with violation of 18 U.S.C. § 2314. The

case was assigned case number 19-cr-20389 and is pending before the Honorable Nancy G. Edmunds.

q.    In addition to purchasing electronics from Ace, Prime/iMobile also purchased electronic devices directly from individual sellers.

r.    In March 2019, an undercover HSI agent (UC-2) went to iMobile and spoke to a man who identified himself as "Sam." Based on a photograph, UC-2 identified "Sam" as Farhan. UC-2 asked Farhan if he purchased iPhones and Farhan replied that he did. UC-2 showed Farhan a box of iPhones in their original packaging. Farhan asked UC-2 if they were locked or unlocked. Farhan also asked UC-2 if they were brand new and whether they had been used. UC-2 replied that he had a "hook-up" for the phones, and mentioned that he got them by "five-finger discount," a slang reference to getting items by theft or fraud.

s.    Farhan took the phones to his desk and began scanning them into his computer. Farhan and UC-2 negotiated a price of $750 per phone. Farhan then gave UC-2 a form to sign verifying that the iPhones were not stolen; Farhan said he would keep the form in his

store for protection. UC-2 refused to sign the form, gave Farhan his cell phone number, and left the store.

t.     Approximately 15 hours later, UC-2 received a text message from a number he did not recognize. The person sending the text stated that he buys phones and asked UC-2 if he had phones for sale. The sender told UC-2 that he got UC-2's number "from a guy who had phone store that you offered him phones yesterday." The sender asked UC-2 for details about the phones, such as their memory, quantity, and UC-2's price. UC-2 told the sender he had "3-256 and 1-64 left," that he gets them all the time, and that they were brand new in sealed boxes and unlocked, except for the ones "your boy" (referring to Farhan) opened and scanned earlier. UC-2 and the sender negotiated a price of $725 for "256s" and arranged to meet in a Kroger parking lot. UC-2 met the sender, who called himself "Ryan," in the Kroger parking lot as agreed, and sold Ryan four iPhones for a total of $2,800. When Ryan left the parking lot, agents observed Ryan drive directly to the iMobile store on Cincinnati Columbus Road.

u.     After purchasing electronics as described, iMobile/Prime sell

and ship the electronics overseas. Export information provided by U.S. Customs and Border Protection (CBP) shows that Prime/Farhan sent 19 exports to the United Arab Emirates and 16 exports to Hong Kong between October 2, 2018 and February 2, 2019. Of the 35 exports, Farhan described 34 as smartphones and one as tablets. Farhan declared that the 35 exports contained 5,693 items, with a value of $4,700,717.

      v.    Through investigation, agents learned of several bank accounts controlled by Ace or its associates. Specifically, investigation identified a Fifth Third Bank account ending in 9507 (Fifth Third 9507) titled to Ace with Montaser identified as the only signer. Records for Fifth Third 9507 show that Montaser deposited a $154,931 Comerica cashier's check into this account on October 4, 2018. The cashier's check was derived from an account titled to Montaser at Comerica ending in 7939. Bank records also show that significant amounts of cash were withdrawn from Ace's Fifth Third 9507.

      w.    Investigation also identified a JPMorgan Chase account ending in 2151 (Chase 2151) in the name of LKA Wireless, LLC (LKA).

Per the Michigan Department of Licensing and Regulatory Affairs, Manni's fiancé, Valentina Elia (Valentina) organized LKA as a "Cell Phone Wholesale" business. Valentina was the only signer on Chase 2151. Valentina also held a personal account at Chase ending in 1698 (Chase 1698).

x.     In addition to being Manni's fiancé, Valentina worked at Ace. During surveillance, agents observed a 2018 GMC Yukon registered to Valentina at Ace numerous times between the hours of 12:00 noon and 6:00 p.m. An undercover HSI agent also reported that a female named Valentina worked at Ace. In fact, on October 4, 2018 Valentina paid the undercover agent $2,800 for four iPhones.

y.     In addition, Valentina communicated with both Manni and Montaser. Between March 4, 2018 and March 22, 2019, Manni and Valentina called each other approximately 1,002 times. Similarly, Montaser and Valentina called each other approximately 182 times between March 19, 2018 and March 17, 2019.

z.     Investigation also revealed several bank accounts controlled by Prime/Farhan. Specifically, investigators identified JPMorgan Chase

account ending 1373 (Chase 1373) and New Horizons Credit Union account ending in 3059 (NHCU 3059). Both Chase 1373 and NHCU 3059 were titled to Prime and identified Farhan as the only authorized signer.

aa.    Information provided by Chase Bank revealed that Chase 1373 received 21 wires, totaling approximately $1,153,669, from overseas businesses between August 27, 2018 and November 30, 2018. Of these wires, three wires, totaling approximately $102,683, were from United Arab Emirates-based businesses, and 18 wires, totaling $1,050,986, were from businesses based in Hong Kong and Taiwan.

bb.    Included in these 21 wires was an October 24, 2018 wire for approximately $50,695 from a company in Dubai, United Arab Emirates. CBP's export records show exports, described as smartphones valued at $104,935, from Prime to the same Dubai company. Similarly, on November 30, 2018, Chase 1373 received a wire for approximately $99,982 from a company located in Taipei City, Taiwan. CBP's export records show an export, described as smartphones valued at $189,485 from Prime to the same Taiwanese company.

18

cc.    As discussed, the described scheme required significant amounts of cash to pay for the fraudulently obtained electronic devices. Bank records confirm that Prime withdrew significant amounts of cash from its accounts. There were approximately 19 cash withdrawals from Prime's NHCU 3059 totaling about $1,466,000. Included in these withdrawals are cash withdrawals that roughly correspond to Montaser's GPS monitored travel to Cincinnati, Ohio. For example, Prime withdrew $100,000 on October 24, 2018. On the same date, Montaser's vehicle traveled from Sterling Heights, Michigan to Cincinnati, Ohio. Another $100,000 withdrawal occurred on October 30, 2018, a day before Montaser's vehicle was stopped returning from iMobile with $65,000 cash.

dd.    Bank information shows that Prime's Chase 1373 wired funds to Ace's Fifth Third 9507 in November 2018. In addition, Prime conducted approximately 15 wires, totaling $812,005, from its Chase 1373 to LKA's Chase 2151. Prime transferred $100,000 from Chase 1373 to Valentina's Chase 1698 on November 8, 2018.

ee.    Prime also moved money between its own accounts. From

September 17, 2018 to December 18, 2018, Prime's Chase 1373 wired

$1,349,500 into Prime's NHCU 3059.

ff.    HSI agents executed a federal search and seizure warrant at

iMobile on April 10, 2019. The search resulted in the seizure of

$84,587.00 cash from the store's safe and 1,049 electronic items and

accessories. Further investigation and analysis of these items is

continuing.

gg.    Farhan's brother, Wisam Farhan, arrived at iMobile during

the search. Shortly after arriving, Wisam Farham left the store and

drove to Farhan's residence. Agents observed Wisam Farhan enter the

house, remove a black bag, and leave at a high speed. Ohio law

enforcement stopped Wisam Farhan after observing multiple traffic

violations. During the traffic stop, a trained drug-detection K-9 alerted

to the odor of a controlled substance from Wisam Farhan's vehicle,

prompting a search of the vehicle. During the search, officers found the

black bag that Wisam Farhan had taken out of his brother's home. The

bag contained business documents, a laptop computer, a tablet

computer, a large amount of U.S. currency, and a handgun. Ohio law

enforcement found additional bundles of currency under the vehicle's seats. The combined currency from the vehicle totaled $60,000. Investigation of the other items located in the vehicle is continuing.

## **Claim for Relief**

20.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 19 above, and the subparagraphs therein.

21.     The Defendants *in rem* are forfeitable to the United States of America under Title 18, United States Code, Sections 981(a)(1)(C) and/or 981(a)(1)(A) as property derived from proceeds traceable to violations of Title 18, United States Code, Sections 371, 554, 1952, 1956, 1957, 2314, and 2315 and/or property involved in a transaction or attempted transaction in violation of Sections 1956 or 1957.

22.     Plaintiff, the United States of America, respectfully requests that warrants for arrest of the Defendants *in Rem* be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in Rem* condemned and forfeited to the United States of

America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

ADRIANA DYDELL
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9125
adriana.dydell@usdoj.gov
(California Bar #239516)

Dated: 10/8/19

22

## VERIFICATION

I, Christian Walter, am a Special Agent with Homeland Security Investigations (HSI). I have read the foregoing Complaint for Forfeiture, and declare under penalty of perjury of the laws of the United States of America that the facts contained therein are true to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents and/or officers.

Special Agent Christian Walter
Homeland Security Investigations

Dated: 10/08/2019